FILED

2016 Aug-16  AM 09:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **RONALD C. PRESTON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.:  4:15-CV-049-VEH** |
| | ) |
| **AMERICAN INTERSTATE** | ) |
| **INSURANCE COMPANY,** | ) |
| **COMPANY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Subsequently discovered evidence of a doctor's medical mistake does not,
without more, a triable action for outrage and conspiracy make. Plaintiff Ronald C.
Preston ("Mr. Preston") initiated this tort of outrage and conspiracy to commit tort of
outrage lawsuit against Defendants in the Circuit Court of Marshall County, Alabama
on December 17, 2014. (Doc. 1 at 1 ¶ 1); (*see also* Doc. 1-1 at 2-6 (attaching state
court complaint)).[1] Mr. Preston's present dispute is connected to an underlying
workers' compensation claim (the "WC Action") brought against Mr. Preston's

---

[1]  All page references to Doc. 1-1 correspond with the court's CM/ECF numbering system.

former employer Umicore Specialty Chemical ("Umicore") that was settled on September 9, 2013 (Doc. 75-3 at 2-3),[2] approved by the Circuit Court of Marshall County, and dismissed on October 7, 2013. (Doc. 75-4 at 6-7).[3]

Defendants, on the basis of diversity jurisdiction, removed Mr. Preston's case to this court on January 12, 2015. (Doc. 1 at 3 ¶ 7). The Defendants remaining in the action[4] are American Interstate Insurance Company ("AIIC"), the workers' compensation carrier for Umicore (Doc. 1-1 at 2 ¶¶ 1-2) and Amerisafe, Inc. ("Amerisafe"), the third-party administrator responsible for managing Mr. Preston's workers' compensation claim. (Doc. 1-1 at 2 ¶ 3).

Pending before the court is Defendants' Motion for Summary Judgment (Doc. 69) (the "Rule 56 Motion") and *Daubert* Motion To Strike or Exclude the Opinions and Testimony of Plaintiff's Expert (Doc. 91) (the "*Daubert* Motion"),[5] both of which were filed on January 11, 2016. The parties have provided supporting and opposing

---

[2]  All page references to Doc. 75-3 correspond with the court's CM/ECF numbering system.

[3]  All page references to Doc. 75-4 correspond with the court's CM/ECF numbering system.

[4]  Defendant Forte, Inc. was dismissed from this lawsuit without prejudice on October 6, 2015. (Doc. 57).

[5]  All page references to Docs. 69 and 91 correspond with the court's CM/ECF numbering system.

evidence and briefs (*see* Docs. 70-90, 92-93, 102-04, 110, 112)[6] and the Rule 56 and *Daubert* Motions are now under submission. Defendants also have filed a Notice of Request for Oral Argument. (Doc. 94). For the reasons explained below, the Rule 56 and *Daubert* Motions are due to be granted. Further, because the issues for it to decide are straightforward, the court finds that oral argument is unnecessary.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R . CIV. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510,  91 L. Ed. 2d 202 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270,

---

[6] Docs. 102 and 104 both are named "Evidentiary Submission in Response to Motion for Summary Judgment" and were filed by Mr. Preston on February 1, 2016, and February 2, 2016, respectively. The initial pages of each document list 16 categories of evidence relied upon by Mr. Preston. *Compare* Doc. 102 at 1-2, *with* Doc. 104 at 1-2. Doc. 102 contains exhibits 1 through 6 and Doc. 104 covers exhibits 7-16.

1274 (11th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

## III.   FACTUAL BACKGROUND[7]

### A.   Mr. Preston's Work-Related Injury and Treatment

On October 20, 2011, Mr. Preston, a now former employee of Umicore, sustained an on-the-job injury when a heavy gearbox, reportedly weighing about 500 pounds, fell from its mounting and struck his left hand. AF No. 1.[8] Mr. Preston was

---

[7] This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007) (observing that "a summary judgment proceeding . . . by definition involves no findings of fact . . . ."). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

[8] The designation "AF" stands for admitted fact and indicates a fact offered by Defendants that Mr. Preston has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Under Appendix II of the court's uniform initial order (Doc. 2) entered on January 13, 2015, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). For Mr. Preston, more specifically, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17). Consequently, whenever Mr. Preston has inadequately asserted a dispute over a fact that Defendants have otherwise substantiated with an evidentiary citation, the court has reviewed the cited evidence and, if it in fact fairly supports Defendants' factual assertion, has

treated at the ER at Marshall Medical Center North ("MMCN") where his laceration was sutured and x-rays demonstrated a  second metacarpal fracture.[9] AF No. 2. The emergency room physician, Dr. Stewart, referred Mr. Preston to Dr. Robert Allan Maples ("Dr. Maples"), who was the 24 hour on-call surgeon for The Orthopedic Center ("TOC") in Huntsville on October 20, 2011. AF No. 3.

Dr. Maples completed medical school at LSU; did his residency at University of Mississippi; and a Seattle Fellowship in orthopedic trauma including traumatic injuries to the hand. AF No. 4. Dr. Maples examined Mr. Preston in clinic on October 24, 2011, with a history of a crush injury to his hand and a fractured metacarpal. AF No. 5. Dr. Maples did new x-rays on October 24, 2011, and he interpreted these results to show a second metacarpal shaft fracture with displacement, consistent with the x-ray report received from MMCN. AF No. 6. Dr. Maples observed that Mr. Preston's hand was swollen and infected and these conditions needed to be treated and resolved before an open reduction internal fixation ("ORIF") procedure could be

---

accepted Defendants' fact. On the other hand, whenever Mr. Preston has adequately disputed a fact offered by Defendants, the court has reviewed the evidence cited by Mr. Preston and, if it in fact fairly supports Mr. Preston's factual assertion, has accepted Mr. Preston's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' statement of undisputed facts as set forth in Doc. 69 and responded to by Mr. Preston in Doc. 103.

[9] A metacarpal fracture is a break of the metacarpus. The Merriam-Webster's Online Medical Dictionary defines metacarpus as "the part of the human hand . . . between the carpus and the phalanges that contains five more or less elongated bones when all the digits are present (as in humans)[.]" http://www2.merriam-webster.com/cgi-bin/mwmedsamp.

done. AF No. 7. As Dr. Maples subsequently testified about the seriousness of the injury that happened to Mr. Preston's hand:

> It depends on the details of how the injury happened. How high did the object fall from, how and what position was the hand in, where did it hit the hand, did it smash the hand between two objects? There's a–all the details matter in a crush injury. . . . It can be a very serious injury. It can be a very simple injury. Depends on the details of the injury.

AF No. 8.

On November 3, 2011, Dr. Maples examined Preston's hand and scheduled a return office visit in two weeks to allow the swelling to subside, which visit occurred on November 21, 2011. AF No. 9. In the interim, on November 7, 2011, Brenda Cartwright at TOC faxed a precertification request to Forte, the pre-cert vendor utilized by AIIC, and the requested ORIF surgery was approved and faxed on November 8 and an approval report was faxed again on November 9, 2011. AF No. 10. It is routine practice for health insurance, *i.e.*, Blue Cross Blue Shield, and workers' compensation insurance to utilize such pre-certifications before surgery. AF No. 11.

During the office visit on November 21, 2011, Dr. Maples determined that Mr. Preston's hand laceration was healing and he was now suitable for surgery. AF No. 12. Dr. Maples completed the ORIF procedure on November 22, 2011, and Mr. Preston was discharged with his hand bandaged and splinted. AF No. 12. On

6

November 22, 2011, Dr. Maples did not believe there was any fracture to Mr. Preston's thumb. AF No. 13.

Dr. Maples examined Mr. Preston at the TOC on December 8, 2011, and identified no abnormality to his thumb. AF No. 14. On January 5, 2012, Dr. Maples did x-rays and, again, found no abnormalities of the thumb, and recommended physical therapy. AF No. 15. Mr. Preston received TTD workers' compensation disability benefits until his return to work on about January 9, 2012. AF No. 16.

Physical Therapist Cozzens wrote a letter to Dr. Maples on January 26, 2012, and indicated that Mr. Preston had progressed well over his six weeks with 0/10 pain level and grip strength of 95 pounds on left and 115 pounds on right. AF No. 17. When Dr. Maples examined Mr. Preston on February 15, 2012, he indicated in his treatment notes that they "discuss[ed] the option of getting a CT scan of [Mr. Preston's] left hand and wrist for further evaluation of his left thumb and carpus; however at this time [Mr. Preston] s[tated] that he is very satisfied and does not want any further orthopedic treatment of his left hand." AF No. 18. Dr. Maples testified that during the February15, 2012, visit, he was the one who raised the topic of the slight angulation of the thumb, not Mr. Preston. AF No. 19. Dr. Maples further indicated to Mr. Preston that a CT would help evaluate any possible surgery, but that Mr. Preston refused this option. AF No. 19. Dr. Maples made the decisions regarding

Mr. Preston's return to work dates and any limitations on his return to work status. AF No. 71. Dr. Maples testified that, effective March 12, 2012, he allowed Mr. Preston to return to work with no restrictions and that work restrictions are medical decisions by him as the physician and declined further treatment. AF No. 20. However, Mr. Preston, without citing to any record evidence, disputes that he was able to so return. After March 12, 2012, neither Mr. Preston nor his attorney contacted Dr. Maples for any return visit or further treatment. AF No. 22.

### B.   Mr. Preston's WC Action and Stroke Lawsuit

On June 19, 2012, Mr. Preston's attorney faxed a letter to Defendants' claims adjuster Paul Byrnes ("Mr. Byrnes") enclosing the workers' compensation suit and stating "I will be most happy to work with you on this matter." AF No. 23. A prior letter from Mr. Preston's counsel to Mr. Byrnes inquired about the "design, installation or maintenance" of the MATCON machine in question. AF No. 23. The WC Action filed on June 7, 2012, alleged that Mr. Preston's "medical benefits, care and treatment have as of the date of this complaint been provided as required by the Workers' Compensation Act of Alabama." AF No. 24.

On about March 25, 2013, Defendants inquired of Dr. Maples as to any rating; in response, Dr. Maples referred Mr. Preston to rehabilitation medicine specialist Dr. Brian Carter ("Dr. Carter") at TOC. AF No. 25. Dr. Carter's report dated May 14,

2013, gave Mr. Preston a 3% impairment of the hand. AF No. 25. Dr. Maples concurred with this assessment. AF No. 25. The 3% impairment to the upper extremity results in a scheduled injury benefit of $1,452. AF No. 28.

On July 3, 2013, Mr. Preston's deposition was taken in his WC Action. AF No. 29. Mr. Preston confirmed that he had not seen any physician about his hand since Dr. Maples in March 2012. AF No. 29.

Mr. Preston was treated by his family physician, Dr. Hargraves, for a stroke in November 2012. AF No. 30. The parties dispute whether the stroke was related to Mr. Preston's hand injury (Doc. 103 at 2 ¶ 30), and Mr. Preston filed a lawsuit against Umicore in 2015 (the "Stroke Lawsuit") to determine whether the stroke is covered as a work-related injury. (*Id*. ¶ 31); AF No. 33; (*see also* Doc. 90-2 at 2-8 (attaching state court complaint in CV-15-900388)).[10] The Report of Claim indicates that his stroke was not work-related (Doc. 90-1 at 9),[11] but Mr. Preston maintains that is because Defendants told him that he could not file it as a workers' compensation claim. (Doc. 103 at 2 ¶ 32); AF No. 31.

Dr. Carter has treated stroke patients and testified that Mr. Preston's cerebral vascular accident (stroke) was not caused by his hand injury and that his work did

---

[10] All page references to Doc. 90-2 correspond with the court's CM/ECF numbering system.

[11] All page references to Doc. 90-1 correspond with the court's CM/ECF numbering system.

not contribute to his mild stroke. AF No. 35. Mr. Preston had hypertension and diabetes, conditions which can lead to a stroke. AF No. 36. After being off work due to his stroke, Mr. Preston returned to his maintenance job at Umicore in May 2013. AF No. 37. Mr. Preston testified in his July 3, 2013, deposition that he was able to perform a variety of maintenance tasks upon returning to work, including going up on the roof, boring holes and bolting a broken step, changing the handle on a broken valve, building a 19 foot, half circle guard and then painting it, running copper pipe, installing a couple of safety showers, running a heat trace on pipe and insulating it, and using a torch, metal saw, clamps, welder, wrench, and screwdriver. AF No. 37. Prior to his deposition, Mr. Preston also drove his tractor and used its forklift attachment to lift and place a front-loading washing machine on a platform that he had built at his home. AF No. 38.

On August 22, 2013, Mr. Preston's counsel faxed to Defendants' counsel a report obtained from Dr. Todd Smith ("Dr. Smith"), who had reviewed x-rays of Mr. Preston's hand and opined that he saw what "appears to be a healed trapezial fracture subluxation." AF No. 39.  Dr. Smith interpreted the old intraoperative x-rays from Huntsville Hospital taken on November 22, 2011, and stated in his report that "it does look like the trapezium is slightly, dorsally, subluxed, though the films are not clear

10

on this."[12] AF No. 40. Mr. Preston reported to Dr. Smith that "he [wa]s pain free." AF No. 41.

A mediation of the WC Action took place on September 9, 2013, at which time the case settled for the lump sum of $20,000 with future medical benefits remaining open and Defendants' agreeing to relinquish any statutory subrogation lien (which amounted to $25,516) because Mr. Preston planned a products liability action against manufacturer MATCON. AF No 42. On October 7, 2013, the parties filed a petition to approve settlement agreement in state circuit court and the petition was granted. AF No. 43. It is permissible for a workers' compensation claimant to close-out future medical benefits in consideration for a monetary settlement and the courts can approve such a closure if that option is part of the parties' resolution. AF No. 44.

### C.    Mr. Preston's Products Liability Action

In 2012, Mr. Preston proceeded with his plans to file an action against MATCON in the Circuit Court of Marshall County (CV-2012-128) (the "Products Liability Action"). (Doc. 75-6 at 3).[13] Mr. Preston filed an amended complaint in the Products Liability Action on October 20, 2013, alleging the tort of outrage against Defendants. AF No. 45; (*see also* Doc. 75-6 at 8 (alleging outrage against

---

[12]   The trapezium is "a bone in the distal row of the carpus at the base of the thumb[.]" http://www2.merriam-webster.com/cgi-bin/mwmedsamp.

[13]   All page references to Doc. 75-6 correspond with the court's CM/ECF numbering system.

Defendants)). On November 11, 2013, Preston filed a second amended complaint, adding TOC, Dr. Maples, and Forte to the Products Liability Action. AF No. 46. After Defendants had filed a motion to dismiss and/or motion for summary judgment, Mr. Preston's attorney sent a letter to Defendants' counsel dated December 6, 2013, requesting a review by a "panel of four physicians."[14] AF No. 47. Although Mr. Preston's last treatment by Dr. Maples was in March 2012, Defendants did not contest the December 6, 2013, request for a panel of four and provided to Mr. Preston's counsel a list of four "hand reconstruction" surgeons as requested. AF No. 49.

### D.    Dr. Meyer's Review of Mr. Preston's Medical Records

After various selections from the panel of four did not agree to schedule an appointment with Mr. Preston, Defendants requested Dr. Richard Meyer ("Dr. Meyer") at UAB to see Mr. Preston and he agreed to do so. AF No. 50. A copy of his office notes dated May 28, 2014, and June 5, 2014, (after TOC sent x-rays to Dr. Meyer) were provided to Mr. Preston's counsel in a June 13, 2014, letter. AF No. 50. Dr. Meyer is a board certified orthopedic surgeon at UAB with a subspecialty in hand surgery in which  he has practiced for over 30 years. AF No. 51. Dr. Meyer studied

---

[14] Under the Act, an employee may request a panel of four if he is dissatisfied with his initial treating physician. *See* Ala. Code § 25-5-77(a) ("If the employee is dissatisfied with the initial treating physician selected by the employer and if further treatment is required, the employee may so advise the employer, and the employee shall be entitled to select a second physician from a panel or list of four physicians selected by the employer.").

the films and opined that there may have been a fracture of the trapezium and that Mr. Preston's residual thumb condition is related to his original injury. AF No. 52.

Mr. Preston returned to Dr. Meyer on September 8, 2014. AF No. 53. Dr. Meyer's dictated notes from that visit indicate that Mr. Preston really did not have any pain and just some degree of hyperextension of his thumb with loss of web space. AF No. 53. Dr. Meyer further indicated that Mr. Preston was at maximum medical improvement or MMI. AF No. 53. The decision as to when a patient reaches MMI is a medical determination by the physician, not the workers' compensation carrier. AF No. 70. Dr. Meyer found no evidence of any nerve injury and Mr. Preston did not complain of numbness or tingling. AF No. 54.

Dr. Meyer further explained that the timing of the ORIF for Mr. Preston's second metacarpal fracture approximately one month after the accident was appropriate because there needed to be time for the infection and swelling to settle. AF No. 55. Dr. Meyer testified that any possible surgery to address the minimal trapezium fracture would also have been subject to the same wait. AF No. 56. Dr. Meyer opined that he would not have operated to fix the trapezium fracture even after the infection settled, because the risks of surgery outweighed the benefits. AF No. 57. Dr. Meyer does not know a hand surgeon who would have offered surgery to the trapezium because the break was so small. AF No. 58.

13

Dr. Meyer indicated that the undiagnosed trapezium fracture was, in effect, treated conservatively, when Mr. Preston's hand was placed in a dressing to let the hand rest before the surgery done by Dr. Maples, and Mr. Preston received good care which complied with the appropriate standard of care. AF No. 59. The Z deformity in the joint of Mr. Preston's thumb that Dr. Meyer noted was caused by carpo-metacarpal ("CMC") arthritis from his injury that was properly treated. AF No. 60. This arthritis is not associated with the fracture of the trapezium. AF No. 61. There was no major step-off of the trapezium fracture, therefore it made no difference in the healing or the amount of subsequent CMC arthritis as to whether it was treated conservatively or with surgery. AF No. 62.

### E.    Undisputed Testimony by Defendants' Claims Adjusters

The deposition of Mr. Byrnes, the claims adjuster who handled this matter from its inception until his retirement in 2013, was taken on February 4, 2014. AF No. 63. Mr. Byrnes met Mr. Preston one time, on November 30, 2011, at his home, 8 days after his surgery, and his hand was bandaged. AF No. 68. Mr. Byrnes remembers telling Mr. Preston that, at some point, Dr. Maples might possibly recommend removal of the pins as an option. AF No. 69. Mr. Byrnes last communicated with Mr. Preston on February 27, 2013, when Mr. Preston called to tell him that Dr. Maples had given him full duty status. AF No. 72.

14

Mr. Byrnes is not medically qualified or able to define the extent of an injury. AF No. 64. Mr. Byrnes never spoke to Dr. Maples, but the TOC staff would send Defendant AIIC copies of the medical treatment reports. AF No. 65. Defendant AIIC did not receive any actual x-ray films. AF No. 65. Dr. Maples treats the patients and would not typically speak to a claims adjuster. AF No. 66. Likewise, Dr. Maples would not typically know the name of the insurance carrier or the claims adjuster's name. AF No. 67.

 Claims adjuster Wendy Phillips ("Ms. Phillips") was hired in March 2013 to fill the vacancy created by Mr. Byrnes's departure. AF No. 73. Ms. Phillips has testified that Mr. Preston's claim file does not indicate any medical treatment by Dr. Maples after March 12, 2012. AF No. 73. Ms. Phillips also has indicated in an affidavit that no medical treatment was denied to Mr. Preston and that Amerisafe had no input about what treatment to render. AF No. 74. Ms. Phillips further stated that AIIC relied upon Dr. Maples to treat Mr. Preston's injury. AF No. 75. Dr. Maples became the authorized treating physician and this authorization was general, *i.e.*, to treat the hand injury, without being restricted as to his treatment. AF No. 76. Ms. Phillips has not spoken not Dr. Maples about this matter. AF No. 77.

### F.    Additional Undisputed Record Testimony

Dr. Maples does a history and physical in order to arrive at his assessment and

15

diagnosis and he did his best for Mr. Preston in accordance with his education and training. AF No. 79. Dr. Maples testified that he had no reason to consider referring Mr. Preston to Dr. Maddox, one of the two hand reconstruction sub-specialists at TOC. AF No. 80. During the litigation, Dr. Maddox reviewed the x-rays and chart and he concurred that Dr. Maples met the standard of care; that surgery on the trapezium was not indicated; that the small non-displaced fracture healed in proper position; and the alleged failure to treat the trapezium including a lack of splinting did not cause the ultimate arthritis deformity. AF No. 81.

Dr. Maples does not need nor does he rely on a claims adjuster who is not a physician or orthopedic surgeon to determine the nature and extent of his patient's injuries. AF No. 82. No one at AIIC/Amerisafe ever denied any treatment that Dr. Maples recommended nor did they refuse to provide or authorize any of his recommended treatment for Mr. Preston. AF No. 83.

In failing to diagnose or treat Mr. Preston's thumb fracture, Dr. Maples did not ignore Mr. Preston's crush injury, but rather he treated Mr. Preston's entire injury as he diagnosed it and his treatment complied with the standard of care. AF No. 85. In February and March 2012, Dr. Maples instructed Mr. Preston to return as needed ("PRN") and that he is obviously welcome to call for an appointment if he has any problem or needs further care. AF No. 86.

### G.    Additional Lawsuits Filed by Mr. Preston

Although the record on summary judgment is unclear when this particular lawsuit was first filed and against which defendants, on November 14, 2014, the Circuit Court of Madison County entered an order dismissing Mr. Preston's complaint in CV-14-27 for lack of subject matter jurisdiction and mooting all pending motions. AF No. 88; (*see also* Doc. 76-2 at 2 (attaching order of dismissal)).[15] Thus, no order on the merits was ever reached in that case.

Shortly thereafter, on December 18, 2014, Mr. Preston filed a new complaint (CV-14-47) in the Circuit Court of Madison County against TOC and Dr. Maples, alleging "Defendant failed to advise Forte and/or Amerisafe that Plaintiff was suffering from a crush injury" and asserting other acts of medical malpractice. AF No. 89. This lawsuit also claimed that Dr. Maples acted in concert with AIIC, and is guilty of the intentional tort of outrage. AF No. 89. On May 11, and November 30, 2015, Dr. Maples/TOC filed a Motion for Summary Judgment with Dr. Maples's affidavit and an amended narrative summary of undisputed facts, including affidavits for Dr. Meyer and Dr. Maddox. AF No. 91. Mr. Preston filed a responsive brief which reiterated the claims of conspiracy between AIIC and Dr. Maples to intentionally fail

---

[15]   All page references to Doc. 76-2 correspond with the court's CM/ECF page numbering system.

to treat his thumb and thereby lessen the liability of the Defendants, but leave him with a deformed hand. AF No. 92. On December 14, 2015, Circuit Judge Alison Austin granted summary judgment in favor of TOC and Dr. Maples. AF No. 93; (*see also* Doc. 89-4 (attaching order granting motion for summary judgment)).[16]

Finally, Mr. Preston filed this action against Defendants (CV-14-50) in the Circuit Court of Marshall County on December 17, 2014, alleging outrage and a conspiracy to commit outrage by Defendants Amerisafe and AIIC and non-party Dr. Maples. AF No. 90.

## IV.   ANALYSIS

### A.   Defendants' Rule 56 Motion

The gist of Mr. Preston's case is that Defendants egregiously and beyond all bounds of decency coerced him to settle his workers' compensation benefits claim by surreptitiously entering into an agreement with Dr. Maples to refuse Mr. Preston proper medical treatment and/or knowingly misrepresent to Mr. Preston the true extent of his thumb injury that subsequently resulted in a residual deformity of his hand. Defendants' Rule 56 Motion contains two developed arguments.[17] First, Mr.

---

[16]  All page references to Doc. 89-4 correspond with the court's CM/ECF numbering system.

[17]  Defendants also briefly mention that Mr. Preston's case is barred by res judicata and/or collateral estoppel. However, given Defendants' minimal discussion of this affirmative defense without detailing which prior final decision on the merits provides the basis for res judicata and/or collateral estoppel (Doc. 69 at 29), the court does not find this particular ground to be adequately

Preston's version of the facts fall substantively short of the clear and convincing evidentiary standard applicable to the tort of outrage under Alabama law. Second, Mr. Preston's outrage claim is time-barred. The court agrees with both contentions.

### 1.   Mr. Preston Lacks Sufficient Evidence To Show Outrage and Conspiracy To Commit Outrage.

Mr. Preston's theory of outrage, as this court comprehends it, is that Defendants coerced him to settle his workers' compensation claim knowing that he had been diagnosed improperly and mistreated by Dr. Maples in order to minimize their financial exposure for Dr. Maples's medical mistake. The exclusivity provision of the Alabama Workers' Compensation Act (the "Act") normally prevents a plaintiff from suing an employer for work-related injury or a workers' compensation carrier for bad faith failure to pay. However, the tort of outrage is an exception to this statutory bar. *See Garvin v. Shewbart*, 442 So. 2d 80, 83 (Ala. 1983), *overruled on other grounds by Lowman v. Piedmont Executive Shirt Mfg. Co.*, 547 So. 2d 90 (Ala. 1989) (holding that tort of outrage is not barred by Act's exclusivity provisions); *Garvin*, 442 So. 2d at 83 ("The conduct giving rise to the tort of outrageous conduct in the context of this kind of case can be more accurately characterized as mental

---

developed or persuasive. In particular, the evidentiary record indicates that Mr. Preston has filed numerous actions against a variety of different defendants and the court cannot readily decipher with one Defendants invoke to substantiate this affirmative defense. (Doc. 76-2 at 2).

assault than as failure to pay compensation or medical benefits even though it may arise in a failure to pay context."); *Lowman*, 547 So. 2d at 93 ("[T]he exclusivity provisions of the Act do not afford protection for injuries *not* caused by a job-related accident[.]") (emphasis in original); *see also Oliver v. Liberty Mut. Ins. Co.*, 548 So. 2d 1025, 1026 (Ala. 1989) ("This Court has held that a claim for bad faith failure to pay an insurance claim in the context of workmen's compensation claims is barred by the workmen's compensation exclusivity provisions, but that <u>a claim based on the tort of outrage is not barred</u>.") (emphasis added) (citing *Nabors v. St. Paul Ins. Co.*, 489 So.2d 573 (Ala. 1986))).

The standard for meeting the outrage exception is an onerous one. The Alabama Supreme Court first recognized the tort of outrage as a viable cause of action in *American Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980) (joining other states in "recognizing that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress"). For an action to be sufficiently extreme, it must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Inmon*, 394 So. 2d at 265. Additionally, "[t]he emotional distress thereunder must be so severe that

no reasonable person could be expected to endure it." *Id.*

Besides satisfying the *Inmon* multifaceted standard, the Supreme Court of Alabama demands a higher level of proof from a plaintiff pursuing an outrage claim against an employer or a carrier. *See Lowman*, 547 So. 2d at 95 ("Therefore, we hold that in regard to a fraud [or an outrage] claim against an employer, a fellow employee, or an employer's insurer, in order to present a claim to the jury, the plaintiff must present evidence that, if accepted and believed by the jury, would qualify as <u>clear and convincing proof</u> of fraud [or outrageous conduct].") (emphasis added); *see also id.* ("In order to insure against borderline or frivolous claims, we believe, in view of the exclusivity clause, that a plaintiff, in order to go to the jury on a claim, must make a stronger showing than that required by the 'substantial evidence rule' as it applies to the establishment of jury issues in regard to tort claims generally."); *Hobbs v. Alabama Power Co.*, 775 So. 2d 783, 787 (Ala. 2000) ("In cases involving an allegation of intentional tortious conduct, this Court has imposed a standard of proof higher than the 'substantial-evidence' standard.") (subsequently citing and discussing *Lowman*); *Soti v. Lowe's Home Centers, Inc.*, 906 So. 2d 916, 924 (Ala. 2005) ("Soti has not produced evidence that, if accepted by the jury, would qualify as clear and convincing evidence of fraudulent suppression on the part of SRS[, *i.e.*, the claims

administrator].").[18]

A key case involving outrage in a coerce to settle context is *Cont'l Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1212 (Ala. 1990). Indeed, both sides have cited to *McDonald* as dispositive of their positions. (Doc. 69 at 25); (Doc. 103 at 19). In *McDonald*, the Supreme Court of Alabama upheld a jury verdict favorable to the plaintiff claiming outrage and pointed out that Mr. McDonald had "introduced a great deal of evidence from which the jury could have concluded that CNA engaged in a pattern of delays in order to cause distress to McDonald and pressure him into accepting a settlement[,]" including (i) experiencing "long delays in paying bills from his pharmacy, hospital, and doctors[;]" (ii) losing access to prescriptions "due to nonpayment from [CNA;]" (iii) enduring harassing "letters from lawyers and past due statements from hospitals[;]" (iv) foregoing prescribed treatment for his back problems due to dubious reasons for delay raised by CNA; and (v) receiving multiple communications from CNA "pressuring him to settle." 567 So. 2d at 1212, 1213. In summarizing why a directed verdict on the outrage claim was not warranted, the court explained:

> The jury was entitled to believe that CNA engaged in a deliberate effort

---

[18] While Mr. Preston does not ever dispute Defendants' application of this higher evidentiary standard in his opposition, the court finds that his outrage claim is substantively deficient even under the less stringent standard of "substantial evidence".

to cause McDonald to suffer severe emotional distress in order to coerce him into accepting an unreasonably low lump-sum settlement that would drastically reduce CNA's liability for his medical expenses. The evidence supports a finding that CNA systematically withheld payments in order to cause McDonald anguish over the possibility of the cessation of medical treatments for his pain and thereby to cause him to accept a method of payment that would not subject him to CNA's 'aggravation,' as he called it. A jury could reasonably find from the evidence that such conduct was 'beyond all possible bounds of decency, ... atrocious [,] and utterly intolerable in a civilized society.' *Inmon*, at 365. Therefore, the denial of CNA's motion for directed verdict and its post-trial motions was not error.

*McDonald*, 567 So. 2d at 1221.

Defendants contend that the undisputed facts in this case approach nowhere close to those at issue in *McDonald*. In particular, Defendants point out that Mr. Preston:  (i) voluntarily stopped seeking any treatment of his hand injury by Dr. Maples in February 2012; (ii) did not experience any delayed payment issues or withheld medical treatment relating to his medical providers; (iii) offered no evidence of <u>undue</u> pressure being placed on him to settle; (iv) settled his workers' compensation claim  in September 2013 through mediation for the lump sum of $20,000 with the advice of legal counsel, future medical benefits left open, and notice of a potential thumb fracture not ever diagnosed by Dr. Maples; (v) sought (without any objections from Defendants) a post-settlement review of his case by a panel of four doctors; and (vi) ultimately received an opinion from Dr. Meyer that surgery was

not recommended for his thumb fracture (after the panel of four process did not result in a recommendation). The court agrees with Defendants that Mr. Preston's case comes nowhere close to *McDonald*.

Nor do Mr. Preston's other cited authorities persuade this court that his outrage claim is cognizable. Mr. Preston's reliance upon *Bradford v. McGee*, 534 So. 2d 1076, 1080 (Ala. 1988) (Doc. 103 at 11) and *Snyder v. Faget*, 295 Ala. 197, 326 So. 2d 113 (Ala. 1976) (Doc. 103 at 17) is puzzling, as neither decision involves a claim of outrage or arises in the context of coercing a plaintiff to settle a claim. *See Bradford*, 534 So. 2d at 1079-80 (describing *prima facie* burden in a medical malpractice case); *Snyder*, 326 So. 2d at 114-115 (describing plaintiff's counts as "negligently or with reckless indifference to the consequences, willfully or wantonly g[iving false] testimony" and as conspiracy to deprive him of liberty and "to defraud him of his property by falsely and fraudulently having him committed to a state mental institution").

Mr. Preston also cites to *Thomas v. Williams*, 21 So. 3d 1234 (Ala. Civ. App. 2008) for support and indicates that "[b]arbaric methods to coerce an insurance settlement qualify for outrage." (Doc. 103 at 19). While *Thomas* does generally recognize this principle, 21 So. 3d at 1240, it is not a workers' compensation case, affirms the trial court's <u>dismissal</u> of outrage on a Rule 12(b)(6) basis, and offers

nothing to substantiate the triable nature of Mr. Preston's outrage claim. Additionally, nothing contained in this record approaches the level of barbaric or ruthless efforts on the part of Defendants to secure an unfair and one-sided settlement of Mr. Preston's WC Action.

Mr. Preston further relies upon *Travelers Indem. Co. of Illinois v. Griner*, 809 So. 2d 808 (Ala. 2001). (Doc. 103 at 21). However, *Griner* is dramatically different because there "[t]he evidence showed that Travelers and Crawford, even though they acknowledged that they were contractually obligated to provide medical care for Griner, did withhold reasonable and necessary items ordered by authorized treating physicians, knowing that their doing so would cause Griner pain and frustration and could lead him to agree to a minimal settlement." 809 So. 2d at 812.

Indeed, as the *Soti* court summarized when affirming summary judgment on an outrage claim over hernia surgery that had been denied to the plaintiff as a disputed compensable injury, 906 So. 2d at 921, there are many examples of cases with more extreme facts than Mr. Preston's in which the Supreme Court of Alabama declined to find outrage viable:

> There is no evidence in the instant case indicating that SRS refused to refer Soti to a general surgeon for treatment of the hernia in an attempt to pressure a settlement of his workers' compensation claim. Although in hindsight it appears that the hernia surgery was necessary and that the hernia was related to Soti's compensable injury, the evidence

demonstrates that SRS's refusal was based on a misunderstanding. Therefore, the trial court did not err in entering a summary judgment on Soti's tort-of-outrage claim. *See Gibson v. Southern Guar. Ins. Co.*, 623 So.2d 1065, 1067 (Ala. 1993) (holding that where the evidence tended to show that the plaintiff's difficulties in obtaining medical care from a workers' compensation carrier were the result of ordinary delays, misunderstandings, and breakdowns in communication at least as much as it tended to show that the delays were due to any deliberate attempt to deny him medical care, summary judgment for the defendants on a claim of outrageous conduct was due to be affirmed); *Farley v. CNA Ins. Co.*, 576 So.2d 158, 160 (Ala. 1991) (holding that the conduct of a workers' compensation carrier indicating an unsympathetic attitude toward the plaintiff, giving the plaintiff the "runaround," failing to timely pay medical bills, and not always authorizing medical treatment the plaintiff sought did not rise to the level of outrageous conduct); and *Wooley v. Shewbart*, 569 So. 2d 712, 715 (Ala. 1990) (holding that a plaintiff's claim that her employer stopped paying workers' compensation benefits for no reason shortly before a scheduled surgery was not conduct so extreme as to support finding of the tort of outrage).

*Soti*, 906 So. 2d at 922. Therefore, the court concludes that no reasonable jury could find for Mr. Preston on the merits of this outrage claim and summary judgment is due to be granted in Defendants' favor.

Although not expressly alleged in his complaint, Mr. Preston asserts in his brief that outrage additionally lies against Defendants due to the fact that his stroke was determined not to be a work-related injury. To the extent that Mr. Preston has properly preserved the alleged improper handling of his stroke as part of his outrage count in this case,[19] he has not substantiated any of his opposing facts pertaining to

---

[19]  This court expresses no opinion on the merits of Mr. Preston's separate Stroke Lawsuit.

his stroke <u>with evidence</u>. Instead, Mr. Preston relies solely upon statements made by his attorney. For example, Mr. Preston nakedly asserts that "Dr. Hargrave[] noted in records that the recent hand surgery was a cause of the stroke; he noted (7) [sic] recent hand surgery as a contributing cause." (Doc. 103 at 20). This is ineffective in opposing summary judgment, as "[s]tatements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980).[20] Instead, it is incumbent upon the non-moving party to identify (and not merely assert the existence of) admissible evidence that demonstrates the existence of a triable issue. Further, Mr. Preston has not explained why a reasonable jury could believe that Mr. Preston was unreasonably coerced into settling his WC Action by virtue of Defendants' denial of his stroke as a compensable claim as the medical event in November 2012 and treatment of that claim as a non-work-related injury (*see generally* Doc. 90-1 (attaching disability insurance documentation relating to Mr. Preston's stroke)) <u>both</u> pre-date his workers' compensation settlement in September 2013. Therefore, the court's analysis of Mr. Preston's outrage claim is unaffected by his unsubstantiated and unpersuasive stroke-related assertions contained in Mr. Preston's brief.

Finally, because Mr. Preston's claim of civil conspiracy is solely premised

---

[20] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

upon the above inadequate outrageous conduct, *see, e.g., Goolesby v. Koch Farms, LLC*, 955 So. 2d 422, 430 (Ala. 2006) ("A civil conspiracy cannot exist in the absence of an underlying tort."), his dependent conspiracy count is likewise cognizably deficient and due to be dismissed.

### 2.    Alternatively, the Statute of Limitations Bars Mr. Preston's Outrage Claims.

"The statutory period of limitations for the tort of outrage is two years." *Cont'l Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1215 (Ala. 1990) (citing Ala. Code 1975, § 6-2-38); *see also Archie v. Enter. Hosp. & Nursing Home*, 508 So. 2d 693, 695 (Ala. 1987) ("[W]e hold that the tort of outrage or intentional infliction of emotional distress is governed by the two-year statute of limitations found in § 6-2-38(*l*).").[21] Nonetheless, at times, Alabama courts have characterized an outrage claim as "a continuous tort" that "will not be barred until two years after the last tortious act by the defendant, particularly where the defendant's conduct does not cross the threshold and become an actionable tort until it is demonstrably extreme and outrageous." *McDonald*, 567 So. 2d at 1215, 1216; *see also Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983) (recognizing that "a defendant's repeated

---

[21]   Section 6-2-38(*l*) provides that "[a]ll actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years." Ala. Code § 6-2-38 (*l*); *see also Jones v. Alfa Mut. Ins. Co.*, 875 So. 2d 1189, 1193 (Ala. 2003) ("The statute of limitations for bad faith claims arising on or after January 9, 1985, is two years." (quoting *Alfa Mut. Ins. Co. v. Smith*, 540 So. 2d 691, 692 (Ala. 1988))).

wrongs to the plaintiff can constitute a 'continuous tort'").

Mr. Preston filed this outrage lawsuit on December 17, 2014. In the absence of meeting the continuous tort standard set forth above, this means that Defendants' outrageous conduct must have occurred on or after December 17, 2012, to be timely.

In his initial opposition, Mr. Preston did not respond to Defendants' statute of limitations defense. Mr. Preston, however, did file a supplemental opposition (Doc. 112) on February 18, 2016, which purports to substantively address the timeliness of his outrage suit. While grasping Mr. Preston's intended points in this supplement is challenging,[22] at least part of his outrage claim appears to be premised upon Dr. Maples's incomplete diagnosis and treatment of his hand injury through February/March 2012, including Dr. Maples's decision to return Mr. Preston to work without any restrictions on March 12, 2012. (Doc. 112 at 2). These events (assuming without deciding that they can even properly be imputed to Defendants), in the absence of a continuous tort, would all be time-barred.

---

[22] For example, without citing to any evidence, Mr. Preston confusingly indicates that "after settlement of the [WC Action] [Amerisafe] continued denial of a stroke suffered on the job, taking place in October of 2013" (Doc. 112 at 2), while the undisputed evidence shows the stroke happened in November 2012. AF No. 30. Also without any evidentiary or CM/ECF citations, Mr. Preston mentions an undated lawyer letter between counsel for non-party Dr. Maples and Defendants' counsel (apparently relating to the deposition of Dr. Maples) as further evidence confirming the timeliness of his lawsuit. (*See* Doc. 112 at 2 ("The conduct of Amerisafe and it's [sic] counsel, with the assistance of counsel for Dr. Maples was exhibited by a letter from Mr. Knox to Joel Williams [that] has previously been filed with this Honorable Court and the conspiracy and delay is evidenced by said letter.")).

The rest of Mr. Preston's outrage claim is tied to the unspecified point in time in which Mr. Preston speculates that Defendants joined forces with Dr. Maples (who Mr. Preston names as a co-conspirator, *id.*) to cover up Dr. Maples's failure to discover Mr. Preston's fractured thumb. Here, the court finds that Mr. Preston lacks concrete evidence of a continuous tort or a pattern of repeated wrongs by Defendants culminating in an action of a sufficient egregious nature–such as withholding needed medical treatment to secure a minimal settlement–and his outrage claim is, therefore, properly time-barred. *Cf. McDonald*, 567 So. 2d at 1216 ("[A]n action such as this, arising from continuing dealings between the parties, will not be barred until two years after the last tortious act by the defendant, particularly where the defendant's conduct does not cross the threshold and become an actionable tort until it is demonstrably extreme and outrageous.").

A summary of the record reflects that Dr. Maples diagnosed Mr. Preston with a fractured metacarpal and treated him for this condition from October 24, 2011, until returning him to work without restrictions on March 12, 2012. In February 2012, Mr. Preston voluntarily declined further evaluation and treatment by Dr. Maples according to dictated office visit notes from that time period. Approximately 6 months later, Mr. Preston learned through an expert report prepared by Dr. Smith that he possibly sustained a fracture at the base of his thumb that had not ever been

diagnosed by Dr. Maples. Nonetheless, on September 9, 2013, Mr. Preston settled his workers' compensation claim for the lump sum of $20,000 and an agreement to leave open future medical benefits. Mr. Preston did not seek further treatment of his hand at any time between February/March of 2012, and the settlement of his claim on September 9, 2013. Consequently, during that time period he was not ever denied medical treatment by Defendants and/or Dr. Maples.

As explained in more detail *supra*, in December 2013, Defendants accepted Mr. Preston's panel-of-four request, and ultimately Dr. Richard Meyer from UAB agreed to review Mr. Preston's case. This review by Dr. Meyer resulted in opinion evidence that the base of Mr. Preston's thumb contained a fracture. Dr. Meyer further opined that surgery to correct this undiagnosed fracture was <u>not</u> recommended. This record is in sharp contrast to the facts in *McDonald*, in which a series of repeated wrongs <u>by the insurance carrier defendant</u> caused the plaintiff to endure extensive mental suffering and led to the application of the continuing tort theory that protected the plaintiff's outrage claim from an untimeliness challenge. Further, Mr. Preston does not point to a pattern of other wrongful, much less egregious, actions by Defendants, cite to any case authority which supports the timeliness of his outrage claim, or otherwise dispute Defendants' statute of limitations' position in a meaningful manner. Accordingly, the continuous tort doctrine has no plausible application here and Mr.

Preston's outrage and conspiracy to commit outrage claims are alternatively barred

by Ala. Code § 6-2-38(*l*).

###### B.    Defendants' *Daubert* Motion

Defendants' *Daubert* Motion seeks to exclude Mr. Preston's proffered expert,

Jack Taylor ("Mr. Taylor") under the seminal decision of *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 583, 113 S. Ct. 2786, 2792, 125 L. Ed. 2d 469 (1993) and

Rule 702 of the Federal Rules of Evidence. (Doc. 91 at 4, 19-20).[23] Defendants offer

three primary reasons for the exclusion of Mr. Taylor's opinions:  (i) Mr. Taylor does

not qualify as an expert in handling workers' compensation claims (Doc. 91 at 4); (ii)

Mr. Taylor does not offer any reliable methodology as required by *Daubert* and its

progeny (*id.* at 10); and (iii) Mr. Taylor does not offer testimony constituting

specialized or technical expertise that would assist the trier of fact to understand the

evidence. *Id.* The court has studied the *Daubert* Motion and finds Defendants'

grounds for excluding Mr. Taylor's opinions to be well-taken.

Mr. Preston has not substantively responded to Defendants' *Daubert* Motion

in a separate filing as required by Appendix III to the court's uniform initial order.

While the court did find a reference to expert evidence in Mr. Preston's summary

judgment opposition brief, there is no mention of the *Daubert* Motion or the

---

[23]  All page references to Doc. 91 correspond with the court's CM/ECF numbering system.

admissibility of Mr. Taylor's opinions; instead, the overall context indicates that the statement relates to non-party Dr. Maples's actions as Mr. Preston's treating physician. (*See* Doc. 103 at 11 ("This case requires no expert testimony as to the breach of the standard of care because it is apparent to a layman." (citing *Bradford*, 534 So. 2d at 1080))). Thus, Defendants' *Daubert* Motion is due to be granted as persuasively presented and substantively unopposed by Mr. Preston.

## V.    CONCLUSION

Accordingly, for those reasons stated above, Defendants' Rule 56 and *Daubert* Motions are both due to granted. Further, Defendants' request to present oral argument is due to be denied. The court will enter a separate final judgment order dismissing Mr. Preston's case with prejudice.

**DONE** and **ORDERED** this 16th day of August, 2016.

_____

**VIRGINIA EMERSON HOPKINS**
United States District Judge